

ATTORNEY FOR APPELLANTS

Alan D. Wilson
Kokomo, Indiana

ATTORNEY FOR APPELLEE

Matthew J. Elkin
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Guardianship of Hellen
Kinney Morris:

Mary M. Kinney and Patrick
Kinney,

*Appellants-Respondents,*

v.

Paul Kevin Kinney,

*Appellee-Petitioner.*

July 12, 2016

Court of Appeals Case No.
34A02-1510-GU-1809

Appeal from the Howard Superior
Court

The Honorable Brant J. Parry,
Judge

Trial Court Cause No.
34D02-1407-GU-23

**Vaidik, Chief Judge.**

# Case Summary

After six siblings disagreed about how to take care of their elderly mother with dementia, one faction of siblings filed a petition to appoint guardians for their mother while the other faction maintained that a power of attorney in effect was sufficient to care for their mother. The trial court found that the mother is incapacitated and appointed all six siblings as co-guardians over different areas of their mother's life. The losing siblings now appeal, arguing that their mother is not incapacitated and that guardians are not necessary.

The record supports the trial court's finding that the mother is incapacitated because there is evidence that she requires assistance to manage her property and provide self-care due to dementia and that she is unable to do either one without substantial around-the-clock help. However, because the mother's attorneys in fact are different than her guardians, according to Indiana Code section 30-5-3-4(b) the attorneys in fact are in control, and the guardians do not have any power with respect to their mother's property and health care. But because it does not appear that the trial court considered the effect of the power of attorney when it determined that guardians were necessary, we reverse and remand this case for the trial court to determine whether guardians are necessary in light of the power of attorney and, if so, to give due consideration to the matters listed in Indiana Code section 29-3-5-5, including the mother's wishes and her existing attorneys in fact. We therefore affirm in part and reverse and remand in part.

# Facts and Procedural History

[3]     Helen Kinney Morris, age eighty-nine, is a widow with six adult children: Michael Kinney, Bridget Aaron, Paul Kevin Kinney ("Kevin"), Patrick Kinney, Mary M. Kinney ("Molly"), and Gabrielle Kinney.   Helen owns "significant property, both real and personal."  Appellants' App. p. 65.

[4]     In March 2004, Helen executed a durable power of attorney appointing two of her children—Kevin "or" Molly—as her attorneys in fact.  *Id.* at 45.[1]  Helen selected Kevin because he had always helped her with her business affairs and Molly because the two of them were close.  Tr. p. 21.  The power of attorney gave Kevin and Molly powers with regard to real-property transactions; tangible personal-property transactions; bond, share, and commodity transactions; banking transactions; business-operating transactions; insurance transactions; beneficiary transactions; gift transactions; fiduciary transactions; claims and litigation; family maintenance; benefits from military service; records, reports, and statements; estate transactions; health-care powers; consent or refusal of health care; delegating authority; and all other possible matters and affairs affecting Helen's property.  Appellants' App. p. 45; *see also* Ind. Code ch. 30-5-5.  The power of attorney specifically provided that it was

---

[1] Indiana Code section 30-5-4-3 authorizes the appointment of more than one attorney in fact.  It provides that unless the power of attorney says otherwise, "if more than one (1) attorney in fact is named, each attorney in fact may act independently of the other attorney in fact in the exercise of a power or duty."  Ind. Code § 30-5-4-3(a).

"not affected by the fact that [Helen] might become incompetent hereafter, but shall remain in full force and effect." Appellants' App. p. 45.[2]

[5] Helen was later diagnosed with mild to moderate dementia. Helen's dementia has remained stable since around 2011 due to medication. Helen has been able to stay in her home because of around-the-clock help from family. This help has included providing all meals for Helen, taking care of her home, helping her bathe, doing her laundry, taking her to doctor appointments, doing her shopping, paying her bills, and having someone spend every night with her.

[6] For most of Helen's children's lives, the family was close knit, with each child having a good relationship with their mother. But things changed after a tornado damaged Helen's house in November 2013 and the siblings disagreed on whether to remodel Helen's bathroom. The siblings took sides, with Molly and Patrick believing that Helen's bathroom did not need to be remodeled and Michael, Bridget, Kevin, and Gabrielle believing that it did. After speaking with Molly, Helen decided not to have her bathroom remodeled. Since this incident—which Michael refers to as when "the iron curtain fell," Tr. p. 178— Michael, Bridget, Kevin, and Gabrielle have had virtually no contact with their mother, as the locks have been changed and phone calls go unanswered. Michael, Bridget, Kevin, and Gabrielle blame Molly.

---

[2] Helen did not designate anyone as her guardian in the 2004 power of attorney. *See* Appellants' App. p. 45.

[7] On July 28, 2014, Kevin filed a petition to appoint guardians for Helen because she "cannot care for herself nor make decisions on her own behalf." *Id.* at 25. He asked the trial court to appoint him and three of his siblings—Michael, Bridget, and Gabrielle—as co-guardians. *Id.* at 25-26. The trial court appointed a guardian ad litem, who met with Helen as well as all six siblings. In its report, the guardian ad litem noted that Helen did not want a guardian. Although Helen recognized that she needed assistance, she was "happy with Molly and Pat[rick] and the way they are caring for her." *Id.* at 42. The guardian ad litem concluded that a guardianship was not necessary because there was a valid power of attorney that "seem[ed] to be working appropriately as it relates to Helen's care and her overall well being." *Id.* at 42-43. In the event that the court appointed a guardian, however, the guardian ad litem recommended "Molly and/or Pat[rick]." *Id.* at 43.

[8] The trial court held a hearing on Kevin's guardianship petition in August 2015. Five of the six siblings (not Patrick), the guardian ad litem, Helen's personal attorney for many years, and other family members testified at this hearing. Specifically, Molly testified that although her mother had memory problems and could not do a lot of things by herself—like bathing, driving, yard work, shopping, cooking, and laundry—she could take care of her affairs with assistance and do other things by herself, like change her clothes, use the restroom, brush her hair and teeth, and put on her glasses and hearing aids. In contrast, the other four siblings testified that Helen's memory problems were worsening and had placed her in situations in which she was endangered, that

she could not take care of herself or her business affairs by herself, that Molly and Patrick were isolating Helen from them, and that they did not know anything about their mother's finances or health. The guardian ad litem testified that although Helen was not able to take care of herself or her business affairs without assistance, Helen was getting that assistance from Molly and Patrick. Tr. p. 132, 135-36. When the trial court asked the guardian ad litem if Helen had decided for herself not to have any contact with Michael, Bridget, Kevin, and Gabrielle, the guardian ad litem said yes but added that Helen's feelings toward them had recently started to "thaw[]." *Id.* at 138. The guardian ad litem aptly described the situation as "a fight between two factions of the family and Helen is the pawn." *Id.* Finally, Helen's attorney for many years (who had prepared Helen's 2004 power of attorney appointing Molly and Kevin as attorneys in fact) testified that Helen did not recognize him during their last encounter and that after November 2013 he did not believe that Helen was able to take care of herself or competent to handle her own affairs. *Id.* at 28.

[9] In October 2015, the trial court issued an order in which it found that Helen was incapacitated. Specifically, the court found that Helen "is incapacitated for [the] reason that she cannot adequately care for her person and estate without assistance." Appellants' App. p. 15 (Finding No. 23). The court also found that guardians were necessary. *Id.* at 16 (Finding No. 26). In determining what sibling to appoint as guardian, the court found that the "foremost" consideration was Helen's best interests and welfare. *Id.* at 15. The court also considered "Helen's happiness in her remaining years" and "the best way to

attempt to repair the family dynamic and the children's relationships with Helen and with each other." *Id.* Based on these considerations, the court found that co-guardians—as opposed to one guardian—were necessary. Accordingly, the court appointed all six siblings as co-guardians. Each sibling was appointed guardian over a specific area of Helen's life. For example, Michael, a priest, was appointed guardian over Helen's "spiritual needs and affairs"[3] while Bridget, a hairstylist, was appointed guardian over Helen's "health care needs and personal hygiene," ensuring that Helen's "hair and nails are styled on a regular basis." *Id.* at 17. In addition, Molly was appointed guardian over Helen's personal finances, while Kevin and Patrick were appointed co-guardians over Helen's "business ventures." *Id.* at 16. The court also created a spreadsheet-like schedule for visitation between Helen and each of her children. *Id.* at 18. Because the court believed that "Helen should have input on all decisions involving her affairs," it ordered each guardian to "consider Helen's input and feelings concerning a specific issue before making a decision. The guardian should consider her input in light of her physical and mental wellbeing at the time." *Id.* at 16.

[10] Molly and Patrick declined their appointments, and in January 2016 the trial court transferred Patrick's guardianship responsibilities to Kevin and Molly's

---

[3] Because "Father Mike lives out of state," Gabrielle was appointed co-guardian over her mother's spiritual needs and affairs. Appellants' App. p. 17.

guardianship responsibilities to Bridget, Gabrielle, and Michael. Appellees'
App. p. 37.

[11] Molly and Patrick now appeal.

# Discussion and Decision

[12] Molly and Patrick contend that the trial court erred in appointing guardians for
Helen. A trial court is vested with discretion in making determinations as to the
guardianship of an incapacitated person. *See* Ind. Code § 29-3-2-4; *In re
Guardianship of Atkins*, 868 N.E.2d 878, 883 (Ind. Ct. App. 2007), *reh'g denied*,
*trans. denied*. This discretion extends to both its findings and its order. *Atkins,*
868 N.E.2d at 883. Thus, we apply the abuse-of-discretion standard to review
the trial court's findings and order. *Id.* An abuse of discretion occurs when the
trial court's decision is clearly against the logic and effect of the facts and
circumstances presented. *Id.*

[13] A guardianship proceeding is initiated by filing a petition "for the appointment
of a person to serve as guardian for an incapacitated person." Ind. Code § 29-3-
5-1. In relevant part, "incapacitated person" means a person who is unable:

> (A) to manage in whole or in part the individual's property;

> (B) to provide self-care; or

> (C) both;

because of insanity, mental illness, mental deficiency, physical illness, infirmity, habitual drunkenness, excessive use of drugs, incarceration, confinement, detention, duress, fraud, undue influence of others on the individual, or other incapacity . . . .

Ind. Code § 29-3-1-7.5(2). The trial court "shall appoint a guardian" if it finds that (1) the person for whom the guardian is sought is an "incapacitated person" and (2) the appointment of a guardian "is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person." Ind. Code § 29-3-5-3(a). The court shall appoint as guardian "a qualified person or persons most suitable and willing to serve, having due regard to," among other things, "[a]ny request made by a person alleged to be an incapacitated person" and "[a]ny person acting for the incapacitated person under a durable power of attorney." Ind. Code § 29-3-5-4; *see also* Ind. Code § 29-3-5-5 (listing people entitled to consideration for appointment as guardian and the order of consideration).

[14] Molly and Patrick first argue that the trial court erred in finding that Helen is incapacitated because "she cannot adequately care for her person and estate without assistance." Appellants' App. p. 15 (Finding No. 23). They highlight that the guardian ad litem did not believe that a guardianship was necessary and that Helen's own doctors believed that she was "capable of making her own decisions when it comes to her care, both personal and financial." *See id.* at 48. But there is evidence in the record that Helen requires assistance to manage her property and provide self-care because of dementia and that she is unable to do either one without substantial around-the-clock help. We

recognize that there is conflicting evidence on this issue; however, the trial court weighed all the evidence and concluded that Helen was incapacitated. We will not reweigh that evidence on appeal.

[15]     Molly and Patrick next argue that guardians are not necessary to care for and supervise Helen or her property as required by Section 29-3-5-3(a) because there is a valid power of attorney. Indiana Code section 30-5-3-4 limits a guardian's power when there is a valid power of attorney:

> (b) *A guardian does not have power, duty, or liability with respect to property or personal health care decisions that are subject to a valid power of attorney.* A guardian has no power to revoke or amend a valid power of attorney unless specifically directed to revoke or amend the power of attorney by a court order on behalf of the principal. A court may not enter an order to revoke or amend a power of attorney without a hearing. Notice of a hearing held under this section shall be given to the attorney in fact.

Ind. Code § 30-5-3-4(b) (emphasis added). According to this section, "if an incapacitated person's attorney in fact is different than the person's guardian, the attorney in fact remains in control unless the trial court" holds a hearing and orders the guardian to revoke the power of attorney. *In re Guardianship of L.R.,* 908 N.E.2d 360, 365 (Ind. Ct. App. 2009*); see also In re Guardianship of Shaffer*, 711 N.E.2d 37, 41 (Ind. Ct. App. 1999) ("[O]nce a power of attorney is created, no guardianship can be imposed with regard to matters that are subject to the power."), *trans. denied*.

[16]     Here, the record shows that in 2004, Helen executed a durable power of attorney appointing Molly and Kevin as her attorneys in fact. This 2004 power of attorney, which gives Molly and Kevin broad powers with respect to Helen's property and health care, is valid.[4] As a result, because Helen's attorneys in fact (Molly and Kevin) are different than her guardians (Michael, Bridget, Kevin, and Gabrielle), according to Section 30-5-3-4(b) the attorneys in fact are in control, and the guardians do not have any power with respect to Helen's property and health care. However, it does not appear that the trial court considered the effect of the power of attorney when it determined that guardians were necessary. For example, the trial court's order appointing the six siblings as co-guardians does not revoke or amend the 2004 power of attorney, and the trial court appointed Bridget guardian over Helen's health care when the 2004 power of attorney gives that authority to Molly and Kevin and appointed Patrick co-guardian over Helen's business affairs when the 2004 power of attorney also gives that authority to Molly and Kevin. Accordingly, we reverse and remand this case for the trial court to determine whether any guardians are necessary in light of the 2004 power of attorney and, if so, to give

------

[4] In May 2014, a letter was apparently sent to Kevin revoking his power of attorney, and Helen allegedly executed a new durable power of attorney and health-care appointment naming just Molly as her attorney in fact. Appellants' App. p. 15, 37. However, both sides proceed on appeal as if the 2004—and not the 2014— power of attorney controls. *See* Appellants' Br. p. 21, Appellees' Br. p. 18. In addition, there is no indication in the record that the trial court has revoked or amended the 2004 power of attorney. *See* Appellants' App. p. 15 (Finding No. 21: "In March, 2004, Helen executed a Durable Power of Attorney appointing [Molly and Kevin] as attorneys in fact."). Indeed, the only power of attorney included in the record on appeal is the 2004 power of attorney. *See id.* at 45.

due consideration to the matters listed in Section 29-3-5-5, including Helen's wishes and her existing attorneys in fact (Molly and Kevin).

[17]    Affirmed in part and reversed and remanded in part.

Barnes, J., and Mathias, J., concur.